# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 10, 2020        Decided July 10, 2020

No. 19-7040

VIPULA D. VALAMBHIA, ET AL.,
APPELLANTS

v.

UNITED REPUBLIC OF TANZANIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00370)

*Meredith B. Parenti* argued the cause and filed the briefs for appellants.

*Lawrence H. Martin* argued the cause for appellees. With him on the brief were *Clara E. Brillembourg* and *Nicholas M. Renzler*.

Before: GARLAND, PILLARD, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: The High Court of Tanzania twice ordered the United Republic of Tanzania to pay Devram

P. Valambhia and family more than $50 million to satisfy the Valambhias' share of a 1985 contract for military equipment. In 2018, members of the Valambhia family filed an action to recognize the High Court's judgments in the District of Columbia. The district court granted Tanzania's motion to dismiss the amended complaint for lack of subject matter jurisdiction under the commercial activity exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(2). We affirm the district court's dismissal.

## BACKGROUND

Because this case was resolved on a motion to dismiss, we accept the amended complaint's factual allegations as true and construe all reasonable inferences in the plaintiffs' favor. *See, e.g.*, *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 395 (D.C. Cir. 2018). We "consider documents attached to or incorporated in the complaint," *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) (internal quotation marks omitted), to the extent the plaintiffs intend incorporation, *see, e.g.*, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1132-33 (D.C. Cir. 2015).

The amended complaint alleges that Tanzania, through its Ministry of Defence, contracted in 1985 to purchase troop carriers, tanks, and other military goods from Transport Equipment Limited (TEL), an Irish corporation that Devram P. Valambhia directed. *See* Am. Compl. ¶ 12 (J.A. 8). Between 1986 and 1989, Tanzania allegedly made the required contractual payments, but then a "dispute arose between TEL and Valambhia as to amounts owed to Valambhia under the contract," and the "Bank [of Tanzania] stopped making payments to Valambhia." *Id.* ¶ 13 (J.A. 8).

In January 1989, Valambhia and TEL attempted to resolve their differences by entering into an "Irrevocable Agreement."

*Id.* ¶ 14 (J.A. 8). Under its terms, TEL agreed "irrevocably [and] unconditionally . . . to surrender fully a total percentage of 45% of the [net] amount received" under the 1985 contract, plus interest and fees, to "Mr. D.P. Valambhia and family." Am. Compl. Ex. B (Irrevocable Agreement) (J.A. 46). The Irrevocable Agreement calculated that the sum owed to the Valambhias at that time was "50,610,495 U.S.D." *Id.* A few months later, the Tanzanian government signaled its amenability to the arrangement between TEL and the Valambhias. First, in May 1989, the Bank of Tanzania acknowledged receipt of the Irrevocable Agreement in a letter sent to "D.P. Valambhia & Family" at a Dar Es Salaam address. Then, in June 1989, the Ministry of Defense followed suit, agreeing with TEL to honor the Irrevocable Agreement, and to "accordingly take with immediate effect all necessary steps to pay directly to the said D.P. Valambhia 45% of all payments due and payable" under the 1985 contract. "Shortly thereafter," the amended complaint alleges, the "Ministry of Defence and the Bank [of Tanzania] began to pay Valambhia some of the amounts owed to him under the contract from the Ministry's Federal Reserve Bank of New York account." Am. Compl. ¶ 15 (J.A. 9).

Tanzania's compliance was apparently short-lived, likely due to continuing disagreements between TEL and Valambhia. In August 1989, TEL filed suit against Valambhia in Tanzania, seeking a judgment requiring the Bank of Tanzania to pay to TEL and not Valambhia the balance of the money owed— notwithstanding the Irrevocable Agreement and Tanzania's acceptance of it. The Tanzanian courts considered that claim for the next fourteen years, with Tanzania itself participating at various stages of the litigation. *See* Am. Compl. ¶ 17 (J.A. 9). According to the amended complaint, Tanzania used this "notorious and highly publicized series of court proceedings in Tanzania" to "avoid paying Valambhia." *Id.*

Nonetheless, the High Court of Tanzania made clear in two judgments issued during the litigation that Tanzania was required to honor its decision to pay the sum owed to Valambhia under the Irrevocable Agreement. First, in a 1991 decree, the High Court concluded that "[Valambhia] and his family are [en]titled to be paid 45% of the proceeds of the money due and payable by the Government of United Republic of Tanzania to [TEL] pursuant to the [1985] contract." Am. Compl. Ex. H at 2 (J.A. 80) (High Court Decree). In light of that conclusion, the High Court decreed that the Tanzanian government "shall pay the proceeds as at the 10th June, 1989"—the date on which the Ministry of Defence agreed to honor the Irrevocable Agreement—"together with interests, arrears, Management fees, service charges surcharges etc. direct to [Valambhia] and his family as per the said agreement." *Id.*

Second, in 2001, the High Court issued a Garnishee Order to the Bank of Tanzania to enforce its 1991 decree, ordering the Governor of the Bank to pay Valambhia the sum of "US $ 55,099,171.66 . . . to the Registrar, High Court of Tanzania Dar es Salaam immediately." Am. Compl. Ex I at 1 (J.A. 82) (Garnishee Order). Tanzania contested the validity of the Garnishee Order for the next several years, but the courts rejected those challenges. *See* Am. Compl. ¶¶ 20-22 (J.A. 10-11). Yet, despite two judgments from its own courts requiring payment, Tanzania never paid the amount owed, *id.* ¶ 23 (J.A. 11), and the family alleges that Devram Valambhia "passed away broken and penniless in Dar es Salaam in 2005," *id.* ¶ 24 (J.A. 12).

In May 2018, Devram Valambhia's wife and children, residents of the United States since 1981 and U.S. citizens since 2001, *id.* ¶ 12 (J.A. 8), sued the United Republic of Tanzania, the Bank of Tanzania, and the Tanzanian Ministry of Defence

(collectively, Tanzania), seeking our district court's recognition of the two Tanzanian High Court judgments under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act of 2011, D.C. Code §§ 15-361 *et seq.* The Valambhias attached to their amended complaint the numerous agreements and judicial decisions relevant to this case, including the contract for military equipment between Tanzania and TEL from 1985, the Irrevocable Agreement between TEL and Valambhia from January 1989, the Bank of Tanzania's acknowledgment of the Irrevocable Agreement from May 1989, the Ministry of Defence's agreement to honor the Irrevocable Agreement from June 1989, and several rulings of the High Court of Tanzania.

Later the same month, Tanzania filed a motion to dismiss for lack of subject matter jurisdiction under the FSIA and for failure to state a claim. The district court granted the motion and dismissed the Valambhias' case on foreign sovereign immunity grounds, *see Valambhia v. United Republic of Tanzania*, No. 18-cv-370, 2019 WL 1440198, at *4 (D.D.C. Mar. 31, 2019), and the Valambhias timely appealed.

## ANALYSIS

We review *de novo* the district court's dismissal of the amended complaint for lack of subject matter jurisdiction under the FSIA. *Schubarth*, 891 F.3d at 398. Where, as here, the "defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Id.* (internal quotation marks omitted). We begin by considering the Valambhias' primary argument that subject matter jurisdiction may be established under clause three of the FSIA commercial activity

exception. We then turn briefly to the Valambhias' remaining arguments.

## I. Clause Three of the FSIA Commercial Activity Exception

The "Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Foreign states are '"presumptively immune from the jurisdiction of United States courts' unless one of the Act's express exceptions to sovereign immunity applies." *Id.* at 394 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)). Here, the Valambhias contend that their claim is based on conduct that falls within the FSIA commercial activity exception, leaving Tanzania without immunity. That exception provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The amended complaint primarily alleges that clause three of the commercial activity exception applies and abrogates Tanzania's immunity.

Clause three requires a plaintiff to show that her lawsuit is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [a foreign government] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (quoting 28 U.S.C. § 1605(a)(2)). With respect to the first requirement, the Valambhias claim that the relevant "act[s] outside the territory of the United States" are the High Court judgments confirming Tanzania's liability to pay the share owed to the Valambhias under the Irrevocable Agreement, as well as Tanzania's subsequent "failure to pay the amounts due under the Tanzanian Judgment[s] and the contract on which it is based." Am. Compl. ¶ 32 (J.A. 14); *see also, e.g.*, Valambhias Br. 25 ("Looking to the core of this suit, at its most essential, it is based upon the act of entering a judgment in Tanzania."). The Valambhias contend the second requirement is also met because the High Court judgments (and Tanzania's withholding of payment) were "in connection with" the underlying commercial activities of contracting in 1985 "to provide military equipment," and the "Bank's continued holding of, and failure to pay, the funds due" under that commercial contract. *Id.* ¶¶ 32-33 (J.A. 14).

We need not consider the "merit of [the plaintiffs'] arguments regarding the first two requirements" because we "conclude that [their] claim fails the final one." *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90 (D.C. Cir. 2005). To satisfy the third requirement, a plaintiff must show that the "act[s] outside the territory of the United States" asserted to satisfy the first requirement "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). In evaluating this direct-effect requirement, our touchstone is the Supreme Court's decision in *Republic of Argentina v. Weltover*. In that case, the Court considered whether Argentina's unilateral

rescheduling of certain bond payments caused a "direct effect" in the United States. *Weltover*, 504 U.S. at 618-19. Crucially, the Court held that an "effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *Id.* at 618 (internal quotation marks and alteration omitted). The effect need not be "substantial" nor "foreseeable," but it must not be "purely trivial" or "remote and attenuated." *Id.* Neither of the alleged direct effects satisfies this standard.

### A. The Ministry of Defence's Use of a New York Bank Account

First, the Valambhias allege that Tanzania's use of a New York bank account to pay them in the 1980s constitutes a direct effect in the United States of the judgments holding Tanzania liable to pay amounts due under its equipment contract with TEL and the Valambhias. According to the amended complaint, "before [Tanzania] stopped paying [Valambhia], the Ministry of Defence and the Bank [of Tanzania] paid Valambhia amounts owed to him from the Ministry's Federal Reserve Bank of New York account." Am. Compl. ¶ 34 (J.A. 15). "Tanzania and its Ministry of Defence acknowledged the Irrevocable Agreement in a contract dated June 10, 1989," the amended complaint explains, and, "[s]hortly thereafter, the Ministry of Defence and the Bank [of Tanzania] began to pay Valambhia some of the amounts owed to him under the contract from the Ministry's Federal Reserve Bank of New York account." *Id.* ¶ 15 (J.A. 9). Noting the significance of a direct effect within the United States for the inquiry under clause three, the amended complaint asserts that the "making of payments through a bank located in the United States alone satisfies the direct-effects element of clause 3." *Id.* ¶ 34 (J.A. 15).

We disagree. As an initial matter, the text of the FSIA forecloses the Valambhias' assertion that the "making of payments through a bank located in the United States alone satisfies" the third requirement. *Id.* Not any nexus to the United States, at any point in the course of dealing, will satisfy the direct-effect requirement. Rather, a plaintiff must first identify an "act outside the territory of the United States" and allege that it "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Correctly posed, the question before us is therefore whether Tanzania's use of a New York bank account was a direct effect of the High Court judgments and Tanzania's subsequent withholding of payment—the acts that the Valambhias assert satisfy the first requirement.

Even construing the amended complaint and record in the Valambhias' favor, we fail to see how that connection may be established here. Tanzania's choice to use a New York bank account at some point in the past is not an "immediate consequence" of the High Court's entry of judgment in 1991 and 2001, nor even of Tanzania's subsequent withholding of payment. As alleged, Tanzania's use of the New York account took place only "before [Tanzania] stopped paying [Valambhia]," Am. Compl. ¶ 34 (J.A. 15), and specifically in the period "[s]hortly []after" the Ministry of Defence acknowledged the Irrevocable Agreement in June 1989, *id.* ¶ 15 (J.A. 9); *see also, e.g.*, Valambhias Br. 2, 5, 12 (reiterating this order of events). In their briefs, the Valambhias imply that Tanzania may have used the New York account when making payments between 1986 and 1989 pursuant to the 1985 contract. *See, e.g.*, Valambhias Reply Br. 19. Be that as it may, Tanzania's earlier-in-time use of a New York bank account cannot serve as an "immediate consequence" of judgments and withholdings that occurred years later. The Valambhias also argue that the record suggests that Tanzania may have made an additional payment to TEL and perhaps Valambhia as late as

2001. *See, e.g.*, Valambhias Reply Br. 1-2, 19, 21; Oral Arg. Rec. 9:57-10:12. But any such payments did not come from the New York account of the Ministry of Defence, but from the Bank of Tanzania's Exchequer Account. *See* Am. Compl. Ex. L at 5, 10 (J.A. 110, 115) (High Court of Tanzania Ruling (10/1/2003)). In these circumstances, Tanzania's use of a New York bank account cannot fairly be characterized as a "direct effect" of the High Court judgments or Tanzania's subsequent failure to pay.

Even setting aside this question of timing, we doubt that Tanzania's use of the New York bank account could constitute a direct effect when nothing about the High Court judgments, nor the underlying agreements, contemplated or suggested that Tanzania would use that account. In relevant part, the Garnishee Order states only that the "Governor of Bank of Tanzania Dar es Salaam" pay the accrued contract sum of $55 million "from Government Accounts operated by the Government of United Republic of Tanzania at your bank." Garnishee Order at 1 (J.A. 82). Expanding the lens to encompass the underlying 1985 Tanzania-TEL contract for military equipment and the 1989 Irrevocable Agreement is of no help as the New York account is not contemplated by those instruments, either. As we have stated in the context of breach-of-contract actions proceeding under clause three, there is "no direct effect where the foreign sovereign 'might well have paid' its contract partner through a bank account in the United States but 'might just as well have done so' outside the United States." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 39 (D.C. Cir. 2014) (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146-47 (D.C. Cir. 1994)). The same conclusion follows here.

A comparison to the circumstances in *Weltover* confirms the shortcomings of this alleged direct effect. There, the

Supreme Court examined whether "Argentina's unilateral rescheduling" of its bond payments—the act abroad satisfying the first requirement of clause three—"had a 'direct effect' in the United States." 504 U.S. at 617 (quoting 28 U.S.C. § 1605(a)(2)). In concluding that it had, the Court relied on the fact that the plaintiffs "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments." *Id.* at 619. "Because New York was thus the place of performance for Argentina's ultimate contractual obligations," the Court concluded that the "rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* The same cannot be said in this case. Tanzania and the Valambhias had no arrangement that called for Tanzania's use of a New York bank account or invited the Valambhias to demand payment within the United States, and so no payments that were "supposed to" have come from a New York account were halted, or indeed affected in any way, by the High Court's judgments. *Id.*; *see also, e.g.*, *Odhiambo*, 764 F.3d at 40-41; *Peterson*, 416 F.3d at 90-91.

The Valambhias reply by citing a variety of cases they claim show that any involvement of a United States bank account—either as a source or destination of funds—satisfies the direct-effect requirement. *See* Valambhias Br. 29-31. But those cases involve some obligation, contractual or otherwise, to make payment into a U.S. account, not merely the foreign sovereign's unilateral choice to make payments from a U.S. account in the past. *See, e.g.*, *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002), *abrogated on other grounds by Samantar v. Yousef*, 560 U.S. 305 (2010). And they generally rely on multiple indicia of direct effect in the United States, not only payment within the United States. *See, e.g.*,

*Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1225 (11th Cir. 2018); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112 (5th Cir. 1985); *SerVaas v. Republic of Iraq*, 653 F. App'x 22, 24 (2d Cir. 2011).

The Valambhias further argue that our interpretation of the FSIA in *Odhiambo* requiring that the place of performance be contractually specified applies only to breach-of-contract actions and not to recognition actions. Valambhias Br. 32 & n.6. But we do not import *Odhiambo*'s rule here. Indeed, the FSIA may require explication of a closer nexus to the United States in the contract context, where the parties themselves control the terms of the agreement, than for other types of claims. But the Valambhias have not explained how even a loose construction of the third clause of the FSIA commercial activity exception could support the conclusion that Tanzania's previous and optional use of a New York bank account constitutes a direct effect or, as *Weltover* put it, an "immediate consequence" in the United States of Tanzania's conduct abroad.

## B. The Valambhias' Residence and Citizenship

Second, the Valambhias claim a direct effect stemming from the family's citizenship and residence in the United States. To be sure, the High Court Decree required Tanzania to pay the sum owed "direct to [Valambhia] and his family." High Court Decree at 2 (J.A. 80). The family therefore contends that because they "moved to the United States in 1981 and became United States citizens in 2001," Tanzania's "non-payment of amounts due to United States citizens under a contract and a judgment based on that contract causes direct effects here." Am. Compl. ¶ 34 (J.A. 15).

Once again, we conclude that this allegation of direct effect is insufficient. We have squarely held that "harm to a

U.S. citizen, in and of itself, cannot satisfy the direct effect requirement." *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010). And we have further rejected the contention that "pay wherever you are" scenarios in which the asserted direct effect in the United States is simply that plaintiffs reside or are citizens here, without more, satisfies this requirement. *Odhiambo*, 764 F.3d at 39; *see also, e.g.*, *Peterson*, 416 F.3d at 90-91; *Goodman Holdings*, 26 F.3d at 1146-47. And in *Odhiambo*, we rejected the possibility that "U.S. presence or U.S. citizenship alone suffices to create a direct effect in the United States" because "the relevant precedents would foreclose any such contention." 764 F.3d at 40 (citing *Cruise Connections*, 600 F.3d at 665; *Peterson*, 416 F.3d at 90-91).

The Valambhias reply that there is in fact something more here that distinguishes this situation from the "pay wherever you are" scenario. The amended complaint alleges that Tanzania "knew that the amounts owed under the Tanzanian Judgment and contract were payable to Plaintiffs in the United States," and was "well aware that the Valambhia family lived in the United States long before the Tanzanian Judgment was entered." Am. Compl. ¶ 35 (J.A. 15); *see also id.* ¶ 25 (J.A. 12). Based on Tanzania's knowledge of their residence, the Valambhias therefore analogize this case to the facts in *de Csepel v. Republic of Hungary*, where we held the direct-effect requirement satisfied even though the "complaint never expressly allege[d]" that any obligation "was to occur in the United States," because the foreign sovereign knew the plaintiffs lived here. 714 F.3d 591, 601 (D.C. Cir. 2013).

This case is materially distinct from *de Csepel*. In *de Csepel*, as in *Weltover*, the foreign sovereign "promised to perform specific obligations in the United States." *Id*. 600-01. The plaintiffs alleged that the Hungarian government had

seized their family's private art collection during World War II, giving rise to a bailment agreement to return the artwork after the war to the U.S.-resident plaintiffs, but then had failed to do so. *Id*. at 596. We concluded that the "direct effect" requirement was met because it was "fairly inferred from the complaint's allegations that the bailment contract required specific performance—*i.e.*, return of the property itself—and that this return was to be directed to [plaintiffs] Hungary knew to be residing in the United States." *Id.* at 601.

By contrast, this case involves no remedy of specific performance or other immediate consequence in the United States flowing from the Tanzanian judgment, so no direct effect here. After all, the Valambhias could have received payment into a bank account in Tanzania, Ireland (home of TEL), the United States, or indeed anywhere else in the world. The Valambhias freely concede that "there is no indication in the record whether Tanzania's payments made from its New York account went to an account in the United States, Tanzania, or some other country." Valambhias Reply Br. 19 n.8. The record further shows that Devram Valambhia was moving between Tanzania and the United States during the relevant time period, and that the Bank of Tanzania had addressed its May 1989 acknowledgment of the Irrevocable Agreement to an address in Dar Es Salaam. *See* J.A. 50; *see also, e.g.*, Oral Arg. Rec. 5:42-6:12 (observation by counsel that "Mr. Valambhia, from what we see in the record, was in Tanzania and in the United States, at various times" and so "very likely could have been in the United States when payments were made"). Even when pressed directly, counsel declined to state whether any of the Valambhias had ever received a Tanzanian payment in the United States on the judgment that forms the gravamen of this case. *See* Oral Arg. Rec. at 4:48-5:22.

The difference between this case and *de Csepel* is therefore clear. The bailment contract for return of the Nazi-looted artwork in *de Csepel* "never envisioned performance anywhere *other than* the United States." *Odhiambo*, 764 F.3d at 42. There is no similar allegation regarding the judgments at issue here.

## II. The Valambhias' Remaining Arguments

We briefly address the Valambhias' remaining arguments. First, in a single paragraph of the amended complaint, the Valambhias allege that clause two of the FSIA commercial activity exception provides an alternative path around Tanzania's immunity here. Under that clause, a foreign sovereign is not immune from suit in the United States "based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). As discussed above, the domestic acts that the Valambhias reference in support of this theory are Tanzania's "payments through a domestic bank" and its "withholding [of] payments due." Am. Compl. ¶ 36 (J.A. 16). But those acts have little to do with the recognition action that forms the basis of this suit. An "action is 'based upon' the particular conduct that constitutes the gravamen of the suit." *Sachs*, 136 S. Ct. at 396 (internal quotation marks omitted). As the Valambhias repeatedly tell us, the "gravamen of the suit [is] recognition of a foreign judgment." *See* Valambhias Br. 2, 12, 25; *see also* Oral Arg. Rec. 11:34-11:36 ("[T]he gravamen of the suit is the judgment"). Treating the payments from the Ministry of Defence's New York bank account as made "in connection with" Tanzania's commercial activity elsewhere is a dead end because the Valambhia's suit here is not based on those payments.

Second, the Valambhias contend on appeal that the district court made various legal errors, including in its analysis of the relative burdens of establishing jurisdiction, its application of the Supreme Court's recent decision in *OBB Personenverkehr AG v. Sachs*, and its categorical conclusion that recognition actions cannot satisfy clause three of the commercial activity exception. *See generally* Valambhias Br. 13-24, 38-48. But we do not rely on any of those assertedly erroneous steps. We review Tanzania's duly preserved claim *de novo*, based on the allegations of the relevant complaint and attachments. Because we "review the district court's judgment, not its reasoning," and "may affirm on any ground properly raised," *Nat'l Mall Tours of Washington v. U.S. Dep't of Interior*, 862 F.3d 35, 40 (D.C. Cir. 2017) (internal quotation marks omitted), our decision should not be taken to embrace aspects of the district court's analysis unnecessary to our decision. We make no general pronouncements about recognition actions under the FSIA, for example, but hold only that, for want of any identified direct effect in the United States of the acts that form the gravamen of the Valambhias' suit, the allegations here do not satisfy the requirements of the FSIA commercial activity exception. Like the Second Circuit in *Transatlantic Shiffahrtskontor v. Shanghai Foreign Trade Corp.*, we need not decide whether, as a categorical matter, "*any* suit brought on a foreign judgment—rather than on the conduct that underlies that judgment—is too distant" to satisfy this exception. 204 F.3d 384, 390 (2d Cir. 2000).

\* \* \*

For the foregoing reasons, we affirm the district court's dismissal of the amended complaint for lack of subject matter jurisdiction.

*So ordered.*